EXHIBIT 2

*Roberts v HUSD*
USDC No. C18-02209-JSC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES ROBERTS, )<br>)<br>Plaintiff, )<br>)<br>versus )<br>)<br>HAYWARD UNIFIED SCHOOL )<br>DISTRICT, )<br>)<br>Defendant. )<br>_____) | **CONDENSED TRANSCRIPT**<br><br>No. C18-02209-JSC |

DEPOSITION OF:   MATTHEW WAYNE

TAKEN ON:        November 6, 2018

REPORTED BY:
Althea L. Miller
CSR No. 3353, RPR, CCRR
File No. 18-26958



MILLER & COMPANY REPORTERS
A Chase Litigation Services Company

EXHIBIT 2

```
 1         DEPOSITION OF MATTHEW WAYNE,
 2     taken on behalf of the Plaintiff at
 3     100 Bush Street, Suite 1980,
 4     San Francisco, California, on Tuesday,
 5     November 6, 2018, at 1:20 P.M., before
 6     Althea L. Miller, CSR No. 3353, RPR, CCRR.
 7
 8
 9  APPEARANCES:
10       For the Plaintiff:
11          LAW OFFICE OF RICHARD M. ROGERS
            BY:  RICHARD M. ROGERS, ESQ.
12          100 Bush Street
            Suite 1980
13          San Francisco, California 94104
            (415) 981-9788
14          RogersRMR@aol.com
15
         For the Defendant:
16
            JACOBSON MARKHAM, L.L.P.
17          BY:  RICHARD M. JACOBSON, ESQ.
            8950 Cal Center Drive
18          Suite 210
            Sacramento, California 95826
19          (916) 854-5969
            rmjacobson@jacobsonmarkham.com
20
21
22       Also Present:  Charles Roberts
23
24  ///
25  ///
```
Page 2

```
 1                    E X H I B I T S
 2  PLAINTIFF'S                                         PAGE
 3  EXHIBIT 10   Copy of a HUSD press                    89
             release, dated April 25,
 4           2017, one page
 5  EXHIBIT 11   Email to Tiffany Elam from              90
             Roberts, dated July 10, 2017,
 6           one page
 7  EXHIBIT 12   Copy of HUSD "Measure L                 91
             General Obligation Bonds
 8           Financial Statements, June 30,
             2017," 14 pages
 9
    EXHIBIT 13   Copy of "Defendant Hayward              92
10           Unified School District's
             Responses to Plaintiff's
11           Interrogatories, Set One,"
             19 pages
12
13
14
15
16           Q U E S T I O N S   M A R K E D
17                      (None.)
18
19
20
21         I N F O R M A T I O N   R E Q U E S T E D
22                      (None.)
23
24  ///
25  ///
```
Page 4

```
 1                  I N D E X
 2  WITNESS                                             PAGE
 3     MATTHEW WAYNE
 4
 5       BY MR. ROGERS                                    5
 6
 7              E X H I B I T S
 8  PLAINTIFF'S                                         PAGE
 9  EXHIBIT 1   Letter to Roberts from Yañez,            42
            dated June 8, 2017, one page
10
    EXHIBIT 2   Copy of "Board of Education              48
11          Resolution 1819 - 06,"
            five pages
12
    EXHIBIT 3   Copy of an Interoffice Memo,             51
13          dated May 9, 2017 to Wayne
            and Ruiz from Roberts
14
    EXHIBIT 4   Email to the Board of Trustees,          65
15          Hayward Unified School
            District from Roberts, dated
16          June 5, 2017, four pages
17  EXHIBIT 5   Email to Roberts from Wayne,             86
            dated May 3, 2017, one page
18
    EXHIBIT 6   Email to Roberts from Wayne,             86
19          dated May 15, 2017, one page
20  EXHIBIT 7   Hayward Unified School District          86
            position description,
21          three pages
22  EXHIBIT 8   Hayward Unified School District          88
            document re:  Measure L,
23          six pages
24  EXHIBIT 9   Copy of "HUSD Organizational             89
            Chart Approximate Cost
25          Breakdown," one page
```
Page 3

```
 1            San Francisco, California
 2            Tuesday, November 6, 2018
 3                  1:20 P.M.
 4
 5                   -oOo-
 6
 7               MATTHEW WAYNE,
 8         having declared under penalty
 9         of perjury to tell the truth, was
10         examined and testified as follows:
11
12                 EXAMINATION
13  BY MR. ROGERS:
14      Q   State your name and address for the record,
15  please.
16      A   Matthew Wayne, 452 Boynton, B-o-y-n-t-o-n,
17  Avenue, Berkeley, California 94707.
18      Q   Okay.  Do you need me to go over the
19  admonitions?  Instructions?
20      A   Not -- no.  I think I'm okay.
21      Q   Okay.  Who are you employed by?
22      A   Hayward Unified School District.
23      Q   When were you first employed by
24  Hayward Unified School District?
25      A   Starting July 2012.
```
Page 5

**Page 38**

```
 1  the conversation.
 2      Q   Was there any conversation about the fact
 3  that he wasn't being paid through -- what do you
 4  call it -- the normal budget?
 5      A   The general fund?
 6      Q   The general fund.
 7      A   He may have said that.
 8      Q   Do you recall?
 9      A   No.
10      Q   So you recall nothing at all except you
11  telling him he was going to be laid off?
12      A   For the first meeting?
13      Q   Yeah.
14      A   Yes.
15      Q   All right.  Let's go --
16      A   I was bringing forward -- yeah -- that his
17  position was going to be eliminated.
18      Q   Did you say, if you recollect, "Your
19  position is going to be eliminated but not you"?
20      A   I don't recollect saying that either.
21      Q   Do you recollect saying "Your position is
22  going to be eliminated and that means you're going
23  to be laid off"?
24      A   I may have said that.
25      Q   Wasn't that the purpose of meeting with
```

**Page 39**

```
 1  him?
 2      A   For the first one, it may have just been to
 3  say "I'm bringing this forward."
 4      Q   Was the purpose of the meeting to tell
 5  Dr. Roberts you were bringing the reorganization
 6  forward and he was going to be eliminated?
 7      A   That his position would be eliminated.
 8      Q   So you told him that?
 9      A   I think so.  In the first meeting, I think.
10      Q   Did you tell him that he would be retained
11  in another position?
12      A   No.
13      Q   Did you tell him anything about his rights
14  to re-employment?
15      A   I don't think in the first meeting.
16      Q   Let's go to the second meeting.
17          What's the first thing you remember about
18  the second meeting?
19      A   I think explaining that -- I think it was
20  after the board had approved a reorganization,
21  and -- or after I brought it forward and his
22  position would be laid off and we'd be having --
23  going for a new position.
24      Q   Okay.  Was Miss Ruiz at this meeting?
25      A   Correct.
```

**Page 40**

```
 1      Q   Was anybody else at this meeting?
 2      A   Not to my recollection.
 3      Q   Okay.  So you told him that you were going
 4  forward with the reorganization?
 5          What else did you tell him?
 6      A   That his position would be laid off and
 7  that there were -- a new position was being created
 8  and we would be going through a recruitment process.
 9          And then I think he asked if he'd be able
10  to apply for the position or was I looking to have
11  him in the position, and I shared that we were --
12  you know, I thought he could apply, he'd be welcome
13  to apply, but I was looking to go into a -- a
14  different direction with that position.
15      Q   What direction were you thinking of going?
16      A   I don't know if -- specifically what I said
17  at the meeting, the one where wanting somebody who
18  would be able to have the full picture of both -- of
19  the bond program as well as all the facilities
20  operations in the District.
21      Q   Did he ask whether he could apply for that
22  position?
23      A   I think he did.
24      Q   What did you tell him?
25      A   I think I said yes, he could, but that I
```

**Page 41**

```
 1  don't know -- I don't think he has the leadership
 2  skills I'm looking for.
 3      Q   Did you tell him that you were looking for
 4  fresh ideas?
 5      A   I don't recall using that phrase
 6  specifically.
 7      Q   Do you recall that you would not have used
 8  that phrase?
 9      A   I feel like -- I feel like I would more
10  likely use the phrase -- I would have said
11  "different direction."
12      Q   He remembers you saying that you wanted
13  fresh ideas.
14          Do you think he's mistaken?
15      A   I don't recall saying it like that.
16      Q   Why did you think that Mr. Roberts was not
17  able to handle the new position?
18      A   I think as I shared there, this new
19  position was going to handle the whole facilities,
20  maintenance, operations, and transportation, and I
21  had seen that, when giving information just about
22  the bond program, it was hard to get the consistent
23  information and explanation for what was happening,
24  and so -- as well as what I shared there was
25  defensiveness or blaming others rather than taking
```

```
 1  responsibility for -- for the information that was
 2  being presented.
 3          And so thinking that this was a broader
 4  scope, you know, I didn't think that -- you know,
 5  that he would be suited for that position.
 6      Q   Did you tell him that?
 7      A   I don't know if those were my exact words
 8  but -- but something to that effect.
 9      Q   Did you tell him that if he applied, he
10  wouldn't be selected?
11      A   I don't know if it were those specific
12  words, but I did say I went -- I think I said I
13  wouldn't recommend him for the position or -- the
14  way it works is you apply and I get three ranks from
15  the personnel commission -- the top three ranks --
16  and I make the recommendation of those top three.
17      Q   I want to show you what's been marked as
18  Exhibit 1.
19          MR. ROGERS:  Do you still have it?
20          THE REPORTER:  Yes.
21          (The document referred to was marked as
22          Plaintiff's Exhibit 1 by the Reporter.)
23          THE WITNESS:  Okay.
24  BY MR. ROGERS:
25      Q   Okay.  So have you ever seen Exhibit 1
```
Page 42

```
 1  before?
 2      A   I may have, but I don't specifically
 3  recall.
 4      Q   Okay.  The first sentence is that:
 5              "... the Board of Education took
 6          action on June 7, 2017 to eliminate
 7          or reduce certain positions due the
 8          lack of work or lack of funds."
 9          Did that apply to Mr. Roberts?
10      A   Yes.
11      Q   Okay.  And what was the lack of work?
12      A   Well, we had eliminated his position and
13  the facilities -- or the maintenance and operations
14  transportation director position and made them one
15  position.
16      Q   Okay.  Ernesto Ramirez took over as bond
17  coordinator; right?
18      A   On the day-to-day operations, yes.  That is
19  a different classification.
20      Q   So there wasn't a lack of work, was there?
21          MR. JACOBSON:  Argumentative and vague.
22  Calls for a legal conclusion.
23          Go ahead.
24          THE WITNESS:  I mean, there was a lack of
25  work for the director -- the chief facilities
```
Page 43

```
 1  officer position in the way that it had been
 2  conceived and how Dr. Roberts had it.
 3  BY MR. ROGERS:
 4      Q   The lack of work had nothing to do with the
 5  bond programs.  I'm saying "programs" because it's
 6  beyond just L, isn't it?  Isn't there L and "I"?
 7      A   Yes.
 8      Q   So those were still ongoing; right?
 9      A   Yes.
10      Q   How long do you foresee them going on in
11  the future?
12      A   Measure I, I think we're almost finished
13  with this year, and Measure L, for the next three or
14  four years.
15      Q   Isn't it going to -- those kinds of --
16  they're building programs; right?
17      A   Right.
18      Q   Aren't they going to be going on for more
19  like 15 years?
20      A   Measure L?  I hope not.
21      Q   The successor to Measure L.
22      A   Well, that's a different bond.
23      Q   What bond is that?
24      A   That's Measure H if it passes.
25      Q   Has it passed?
```
Page 44

```
 1      A   We'll find out today.
 2      Q   Okay.
 3      A   I mean, saying that because there's a bond
 4  program means there's not lack of work.
 5          I mean, we give this letter to employees
 6  when they get laid off; so, you know, if we -- I
 7  mean, we run a whole school district and so -- and
 8  that would be like saying, "Well, you still run
 9  schools.  Why do you need to eliminate a teacher?"
10  because it still changes the amount of work or the
11  scope of the work as well as funding support for the
12  work.
13      Q   Right.
14          So Mr. Ramirez's job outlook is at least
15  15 years?
16      A   If Measure H passes and he -- and we assign
17  him coordination of that bond, then that bond will
18  exist for a while.
19      Q   Is there any reason not to assign him
20  coordination of that bond?
21          MR. JACOBSON:  Hang on.  As phrased, I'm
22  going to instruct him not to answer on the basis
23  that he would be getting into a private employment
24  relationship between another employee and the
25  District.
```
Page 45

```
 1        MR. JACOBSON:  Assumes facts not in
 2 evidence.
 3        Go ahead.
 4        THE WITNESS:  I think she reiterated how
 5 the process would work and that -- you know, that
 6 we'd be going in a new direction.
 7 BY MR. ROGERS:
 8   Q   The "new direction" didn't have anything to
 9 do with the building program itself, did it?
10   A   What do you mean?
11   Q   Well, "new direction" can mean several
12 different things, and I want to make sure we're on
13 the same page.
14        I believe that by "new direction," you mean
15 simply that you were changing the names of
16 positions.
17   A   And I wanted them to manage our facilities,
18 maintenance, operations, and transportation
19 departments.
20   Q   Right.
21        But you don't mean that there was any
22 change in direction in the building program in
23 Measure L or Measure I?
24   A   Not -- I don't think I meant anything
25 specific other than the -- also wanting to make sure
                                              Page 50
```

```
 1 what we were presenting around Measure L was clear
 2 and accurate information.
 3   Q   All right.  Is that when the meeting ended?
 4   A   I think so.
 5        MR. ROGERS:  Okay.  Let's mark as Exhibit 3
 6 an interoffice memo.
 7        (The document referred to was marked as
 8         Plaintiff's Exhibit 3 by the Reporter.)
 9 BY MR. ROGERS:
10   Q   Okay.  While you're reviewing that, I need
11 to ask counsel something.
12        MR. ROGERS:  Dr. Roberts's deposition is
13 set for this month; so I don't have time to do a
14 request for documents.
15        To the extent that the District is relying
16 on email communications with respect to
17 Dr. Roberts's job performance, I request that those
18 be produced at once, like, within a week.
19        MR. JACOBSON:  Explain.  Have you done a
20 document request and you feel like that's responsive
21 and we haven't produced it?  What am I missing?
22        MR. ROGERS:  You're missing initial
23 disclosures.
24        I don't have to do a document request for
25 these types of things, Counsel.
                                              Page 51
```

```
 1        All right.  Enough of that.
 2   Q   Have you had a chance to review Exhibit 3?
 3   A   Yes.
 4   Q   Do you recognize it?
 5   A   Yes.
 6   Q   Do you recall receiving it on or about
 7 May 9, 2017?
 8   A   Not specifically, but I'm sure I did.
 9   Q   Was the meeting on May 8, 2017, the first
10 meeting or the second meeting?
11   A   I believe that was the first meeting.
12   Q   Okay.  So at the first meeting there was
13 more than just advising Dr. Roberts that you were
14 bringing forth a reorganization?
15   A   Well, I don't know that there was.  This
16 doesn't indicate that there was.
17   Q   Okay.  So let's start with the first
18 paragraph.  Is the first paragraph accurate?
19   A   I don't recall that I -- in that meeting I
20 specifically said there was coordination that the
21 thinking behind the reorganization was specifically
22 about him as it was about wanting there to be one
23 person over facilities, maintenance, operations, and
24 transportation.
25   Q   Do you believe that Dr. Roberts fabricated
                                              Page 52
```

```
 1 the first sentence -- the first paragraph?
 2   A   No.  I just think when he puts in
 3 parentheses "me," he's making it personal wherein
 4 that conversation -- I don't know that I said I
 5 had -- it was about him.  It was about the
 6 organization.
 7   Q   Did you express "concerns with the
 8 coordination and communication efforts between the"
 9 chief facilities officer and M&O?
10   A   Yeah.  I think I expressed concern that we
11 have a bond program that's managed by one director,
12 and then we have maintenance, operations, and
13 transportation that is managed by another director.
14   Q   You weren't talking about actual
15 communications; is that right?
16   A   I may have expressed a concern about the --
17 the coordination -- I may have expressed a reason
18 why I had the concern between the two having two
19 different directors is because there wasn't as much
20 coordination and communication as -- than there
21 needed to be.
22   Q   Who was the communicator from M&O?
23   A   So prior to that, it was Steve Fallon who
24 was the director of M&O and then his staff on that
25 side.
                                              Page 53
```

```
 1  respect to the bond programs, are we?
 2      A   I don't recall.  It may have included that
 3  as well.
 4      Q   He says they didn't, further on in the
 5  paragraph.  Do you have any understanding that he's
 6  mistaken?
 7      A   I would have to go back and look.
 8      Q   Do you have any understanding, as you sit
 9  here today, that he is mistaken?
10      A   Not to my understanding right now.
11      Q   Do you have any actual recollection of
12  Dr. Roberts being present at the meetings -- the
13  meeting or meetings that you attended over the
14  problems with purchasing?
15      A   I think he was at the first one I attended.
16      Q   Do you recollect that the problem was that
17  the M&O department had difficulty with following the
18  new directives with respect to contracts?
19      A   I recall that was one of the issues.
20      Q   And do you recollect that in the absence of
21  Mr. Fallon, who is on leave, that Dr. Roberts was
22  helping to resolve those problems?
23      A   Yes.  I think that's why he was at the
24  meeting.
25      Q   Okay.  And the next paragraph, he says that
                                                    Page 62
```

```
 1  he had received no complaints about how his
 2  department is managed.  Your testimony is that you
 3  complained; is that right?
 4      A   Correct.
 5      Q   Was your complaint about management?
 6      A   I think about how the bond program was
 7  being managed.
 8      Q   All right.  In any respect other than the
 9  changes in estimates?
10      A   And -- and the communication about that.
11      Q   Anything to do with management, per se?
12      A   Well, I think it is management.
13      Q   Communication?
14      A   I think that's a part of management.
15      Q   Was he failing to communicate with respect
16  to any of the building projects that were going
17  forward?
18      A   I don't recall.
19      Q   Was there any failure in communication with
20  anybody other than you?
21      A   I think with Vanir, there were issues too.
22      Q   V-a-n-i-r.
23          What issues were there with Vanir?
24      A   Because they were also -- they were our
25  construction managers and part of the conversations
                                                    Page 63
```

```
 1  about why our budgets and program estimates kept
 2  changing.
 3      Q   Okay.  What were Vanir's complaints?
 4      A   I don't recall specific complaints.  You
 5  were asking me if there was, you know -- if there
 6  was communication issues with anybody else, and I
 7  was thinking with Vanir because they would -- I was
 8  not getting consistent information from them either.
 9      Q   I see.
10          Did you think that they were telling
11  stories?
12      A   Yeah.  I think they had shifting
13  explanations too.
14      Q   And you don't remember what the shifting
15  explanations were?
16      A   I'd have to look and see.
17      Q   He says that his relationships with Vanir
18  were exemplary.  Was that a false statement?
19      A   I couldn't say.
20      Q   Do you know that he received awards for
21  some of the projects that he worked on with Vanir?
22      A   I know the District received an award for
23  our STEAM building.
24      Q   Okay.  That was under Dr. Roberts's
25  management?
                                                    Page 64
```

```
 1      A   Correct.
 2      Q   Are you aware of other awards?
 3      A   No.
 4      Q   All right.  Let's mark as Exhibit 4 an
 5  email.
 6          (The document referred to was marked as
 7          Plaintiff's Exhibit 4 by the Reporter.)
 8  BY MR. ROGERS:
 9      Q   Do you recognize Exhibit 4?
10      A   I recognize it.
11      Q   Okay.  Did you respond to it?
12      A   No.  I recognize it because I wasn't -- I
13  don't think I was on this email but a board member
14  forwarded it to me.
15      Q   Okay.  Did you respond to it?
16      A   Not that I recall.
17      Q   Did you talk to the board member about it?
18      A   I don't recall.
19      Q   Did you understand, when you read
20  Exhibit 4, that Dr. Roberts wanted to be hired as
21  the bond coordinator?
22      A   Well, I don't recall reading this carefully
23  when it came in, and this is actually not an
24  accurate description of how we were being organized.
25      Q   That wasn't my question.
                                                    Page 65
```

```
 1   that he was disrespectful -- Mr. Gonzales?
 2       A   Not that I recall.
 3       Q   Did she report that he was disrespectful?
 4       A   Not that I recall.
 5       Q   Did you know that other people in M&O
 6   complained about Mr. Gonzales?
 7       A   No.
 8       Q   His behavior towards women?
 9       A   No.
10       Q   Mr. Yañez didn't tell you about that?
11       A   Not that I recall.
12       Q   Did Mr. -- excuse me -- did Dr. Roberts
13   tell you that he was not comfortable intervening in
14   personnel issues in somebody else's department?
15       A   I don't recall.
16       Q   Were you aware that Dr. Roberts asked for
17   human resources to intervene in the personnel
18   issues?
19       A   I was not aware he asked.
20           As I shared, I had human resources -- I had
21   Delia Ruiz and June Roño to help facilitate between
22   the two departments.
23       Q   I'm talking about the personnel issues
24   involving Mr. Gonzales.
25       A   Oh.  I don't recall.
                                                Page 94
```

```
 1       Q   Do you recall Dr. Roberts advising you that
 2   Measure L was $51 million over budget?
 3       A   Yes.  At some point.
 4       Q   What was your response?
 5       A   I don't recall specifically.
 6       Q   Did he ask you to submit a letter to the
 7   school board advising them about it?
 8       A   I don't -- I don't recall.
 9       Q   Did he give you a draft letter?
10       A   I don't recall.
11           We made a presentation on the budget around
12   that time.
13       Q   Was Dr. Roberts successful in facilitating
14   successful communication between facilities and M&O?
15       A   I don't know.
16       Q   In the meetings in May 2017 between you and
17   Dr. Roberts, at least one attended by Miss Ruiz, did
18   anybody raise their voice?
19       A   Not that I recall.
20       Q   Whichever meeting -- and I'm not sure what
21   your testimony -- whether it was the first or
22   second -- where there was discussion about
23   leadership, do you remember how that discussion came
24   about?
25       A   No.  I think it was the second, and I think
                                                Page 95
```

```
 1   it came about when Dr. Roberts asked about applying
 2   for the new position.
 3       Q   Did he ask for reasons why he shouldn't
 4   apply for the new position?
 5       A   Not that I recall.  I think he asked about
 6   applying for it and I said he could, but then as
 7   I've already testified, I said "I think we're going
 8   in a different direction."
 9       Q   Were you hesitant to give him reasons about
10   why you didn't want him to apply?
11       A   I don't recall.
12       Q   Do you recall him asking many times for
13   reasons before you finally discussed leadership?
14       A   I don't recall it many times.
15       Q   How many times do you recall?
16       A   I don't know.
17       Q   Was there any discussion about replacing
18   Dr. Roberts's position at cabinet meetings?
19       A   Not that I recall.
20       Q   Let me be more focused.
21           Do you have any recollection of discussing
22   the reorganization in terms of eliminating
23   Dr. Roberts's position when he was present at a
24   cabinet meeting?
25       A   No.
                                                Page 96
```

```
 1       Q   Do you have any recollection that he missed
 2   cabinet meetings?
 3       A   No.
 4       Q   In the beginning of the first meeting,
 5   where you advised him that there was a
 6   reorganization, did you say anything about it had
 7   nothing to do with his performance?
 8       A   I don't recall.
 9           MR. ROGERS:  That's all I've got.
10   Unless -- is there anything you want to talk about?
11           We're done as far as I'm concerned.
12           MR. JACOBSON:  All right.  Thank you very
13   much.
14           THE REPORTER:  Certified copy?
15           MR. JACOBSON:  Same thing.  E tran.  You've
16   got my email?
17           THE REPORTER:  Yes.
18
19           (The deposition concluded at 4:09 P.M.)
20
21
22
23
24   ///
25   ///
                                                Page 97
```

```
 1
 2         I, MATTHEW WAYNE, declare under
 3    penalty of perjury that the foregoing
 4    is true and correct, to the best of
 5    my ability.
 6
 7
 8
 9        Dated this ___ day of
10    _____, 2018, at
11    _____,
12    California.
13
14
15
16    _____
            MATTHEW WAYNE
17
```

Page 98

```
 1        I, ALTHEA L. MILLER, CSR No. 3353, certify:
 2        That the foregoing deposition of
 3  MATTHEW WAYNE was taken before me at the time and
 4  place therein set forth, at which time the witness
 5  declared under penalty of perjury to tell the truth;
 6        That the testimony of the witness and all
 7  objections made at the time of the deposition were
 8  recorded stenographically by me and were reduced to
 9  a computerized transcript under my direction;
10        That this transcript is a true record of
11  the testimony of the witness and of all objections
12  and colloquy made at the time of the deposition.
13        I further certify that I am neither counsel
14  for nor related to any party to said action nor
15  interested in the outcome.
16        The certification of this transcript does
17  not apply to any reproduction of the same by any
18  means unless under the direct control and/or
19  direction of the certifying deposition reporter.
20        IN WITNESS WHEREOF, I have subscribed my
21  name this 15th day of November, 2018.
22
23   _____
24       ALTHEA L. MILLER, CSR No. 3353, RPR, CCRR
25
```

Page 99



# Hayward Unified School District
*Building a Culture of Success*



Fernando Yañez, Executive Director, Classified Human Resources

---

**NOTICE OF LAYOFF**

Hand Delivered and Regular U.S. Mail

June 8, 2017

Charles Roberts
1618 E Gate Way #104
Pleasanton, CA 94566

EXHIBIT ____
Althea L. Miller
CSR No. 3853
Date: 11/6/18
Witness: _____

Dear Mr. Roberts:

I regret to inform you that the Board of Education took action on June 7, 2017 to eliminate or reduce certain positions due to a lack of work or lack of funds. As a result of the Board action you will be laid off effective August 6, 2017. A copy of the Board Resolution authorizing the layoff is attached.

Your Chief Facilities Officer position was assigned to work at the Superintendent's Office for 40 hours per week. It was an annual assignment. There are no other positions in your classification into which you can be placed.

If a position in the classification from which you were laid off should become available, you have the right to be reemployed in that position for thirty-nine (39) months. Your name will be certified from a reemployment list in the reverse order of layoff. During those 39 months, you may participate in promotional examinations for positions for which you meet the minimum qualifications. The right to be reemployed means you have preference over new applicants for vacant positions in the classification from which you were laid off.

You may continue your benefits coverage for eighteen (18) months by paying the applicable premiums. If you have questions regarding your benefits, please contact the Employee Benefits Specialist at (510) 784-2600 ext. 72567. You also may be eligible for unemployment benefits. To receive additional information regarding your benefits, please contact the EDD office at 1-800-300-5616.

If you have any questions regarding your layoff rights, please call me at (510) 784-2697 or by email at: fyanez@husd.us. Please accept my best wishes for your continued professional and personal success.

Sincerely,

Fernando Yañez
Executive Director, Classified Human Resources and Personnel Commission

Enclosures:   Board Resolution No. 1617-51
              Education Code (Sections 45114, 45115, 45117, 45298 and 45308)
              Personnel Commission Rules-Layoff (9.1, 9.2, and 9.4)
              EDD Brochure
C:            Lisa Tess, ACSA President
              Benefits Specialist
              Payroll Department
              Personnel File

#1

---

24411 Amador Street, Hayward, CA 94544 | Phone: (510) 784-2697 | Fax: (510) 784-2696 | www.husd.us

HUSD000031



Roberts, Charles <croberts@husd.k12.ca.us>

## Concerns with Reorganization in the Middle of Measure L Bond Program

Roberts, Charles <croberts@husd.k12.ca.us>  Mon, Jun 5, 2017 at 11:31 AM
To: lbrunner@husd.us, lreynoso@husd.us, rcarlson@husd.us, wmcgee@husd.us, awalker@husd.us
Bcc: Charles Roberts <crobertshu@gmail.com>

Date:   June 5, 2017
To:   The Board of Trustees of the Hayward Unified School District
From:   Dr. Charles Roberts, Chief Facilities Officer
Re:   Major Concerns with Pending Elimination of Chief Facilities Officer Position

EXHIBIT 4
Althea L. Miller
CSR No. 3353
Date: 4/6/18
Witness: W Wayne

Good day. I write this message to you, the Hayward Unified Schools Board of Trustees, with great concern for the future of the Measure L Bond Construction program. It has come to my attention that Interim Supt. Matt Wayne is requesting my position as Chief Facilities Officer in charge of Measure L be eliminated, and replaced by a "bond coordinator" who will report to an overall facilities director. Although I would be fully qualified for this new director position, the Interim Supt. and Asst. Supt. of HR informed me on June 2, 2017, that I would never be rehired, "no matter how high I scored".

As you can imagine, I was totally caught off-guard by this announcement, especially when I was originally informed on May 8, 2017, by both Dr. Wayne, and Asst. Supt. Delia Cruz that my job performance was <u>not</u> the reason for reorganizing. Instead, it was suggested that a disconnect existed between my department (Measure L), the Maintenance Operations & Transportation department, and our construction manager, Vanir Construction. I requested an example of such "disconnect" and was not given one. In anticipation of this elimination, I forwarded the attached Memo (Attachment #2) to Supt. Wayne, responding to the perceived disconnect and providing a substantial amount of evidence to refute this conclusion.

While Interim Supt. Wayne did not cite a definitive reason for eliminating my position, the Measure L Bond program has come under extreme scrutiny over the past several months, to the point where I are constantly responding to accusations (typically in the guise of questions) that seem unfounded and not rooted in anything based on fact. Examples include:

> "Why is Measure L is behind schedule?"
> Measure L is NOT behind schedule. Not only are we on schedule, some projects are actually ahead of schedule. All measure L projects will complete 4 years after the initial August 2015 bond sale (except the Performing Arts Center which was put on hold by HUSD in March 2016 by former Asst. Supt. Riccoboni when the estimates came in over budget).

> "Measure L is progressing slower than Measure I"
> Again, this is not a factual statement. Measure I bonds sold in July 2008, with all projects completing 4 years later, in 2012, with the exception of Tyrrell which finished over 6 months late in 2013.

> "What has Vanir done to receive their payments to date?"

ROBERTS 000090

Vanir is our construction management firm, responsible for a host of administrative, managerial, professional, and on-site management tasks to help this bond program progress. Vanir CM payments are significantly lower than what is allowed by contract; management efficiency, employee competence, and ongoing communication between Vanir CM and me ensure a seamless exchange of information. HUSD will save a substantial amount of money in CM fees at the end of the program.

"It's about time we got Cherryland started"
Did you know that Cherryland was accelerated and began six months ahead of schedule?

I understand tough decisions must be made due to the program coming in significantly over budget, however, this was known early in 2016 when the schematic estimates started rolling in. Be advised / reminded that I informed then CBO / Asst. Supt. of Business Services Riccoboni that this program was running about $51M over-budget, to which we were told to continue with the program and allow the Board to decide how to move forward as the program develops, including the removal of several projects from this Measure. I further shared this figure with Interim Supt. Wayne and the entire Executive Cabinet to ensure everyone was in the loop upon Supt. Dobbs exit (see attached e-mail dated August 8, 2016). Unfortunately, I did not have a direct line to the Board and had to rely on this information being shared by others. We have stayed the course and presented cost estimates beginning in February 2016. This program was $12M over budget before we started, as Vanir CM shared with the Board last fall. If we add the $21M overage for the Athletic Field renovations, we were $33M over budget at the start of the very first project. We have since been in a cost reduction and containment mode and have avoided significant increases in overall program costs as we moved from schematic design to construction documents - which is almost unheard of.

Unfortunately, this program was established by a team of people who are no longer working at either the District, or Vanir CM (former Supt. Dobbs, former Asst. Supt Grant-Dawson, former Asst. Supt. Riccoboni, Victor Lopez, Omar Galvin) and we may never know the reasoning behind the budget or the history behind its changes over the years (i.e. in 2014 Cherryland was a K-8 with an $84M budget, not $45M. If I had the additional $39M, I would not be removing projects and would actually be under budget).

This "political" budget is now facing "practical" reality and I find myself losing my position at the helm of this outstanding program because Supt. Wayne is unable to convey where the program started, where it is headed, and the outstanding leadership shown by Vanir, the architects, engineers, and me in providing an outstanding program for Hayward students, in-light of the budget shortfalls that continue to challenge the entire team.

This past Friday, June 2, I met with Dr. Wayne and Asst. Supt. Delia Ruiz again, and it was brought to my attention that a lack of communication and leadership in running this program was the reason for my position being eliminated. I asked for specific examples and I received two vague examples: the information provided at the March 2016 Board presentation, and the information presented at the February 2017 Board presentation.

<u>February 2016 Board Presentation</u>

This is the presentation where the estimate and budget for Cherryland were presented by the architect in terms of "hard costs". When we showed a $45M schematic design estimate, we showed a $36M budget. This resulted in Cherryland being (45-36) $9M over budget. When we converted these figures to "hard+soft" costs, or total costs, we simply added 25% to BOTH the schematic design estimate ($45M + 25% = $56M) AND the budget for the project ($36M + 25% = $45M). This resulted in Cherryland now being $11M over budget. This is a $2M difference that would have been absorbed into the program contingency if we did not have to use it all later in the program. This was explained to then Asst. Supt. Riccoboni and the Board.

February 2017 Board Presentation
This is the latest presentation given to the Board that I **begged** Supt. Wayne not to present because the estimates were outdated and the costs for Cherryland would be increasing "by millions". I met with the Interim Supt. no less than three times in preparation for this presentation, and each time I advised him that the numbers were inaccurate, and that although we can save $12M by removing the 7-8 option, it will not show as a $12M savings because the new estimates were coming in higher. Dr. Wayne simply ignored my continued warnings, presented the report, and now blames me for a "lack of leadership" with this presentation. If there was a lack of leadership, it was in the Interim Supt. not taking the advice of his Bond officer or CM firm. I am not sure if the new estimates were shared with the Board, but Cherryland is now estimated to cost about $60.3M. In summary, Cherryland went from $73M to $56.8M to $63.1M to $51.1 (the inaccurate number) to a current $60.3M. This is only $3M higher than schematics and $13M lower than the first full estimate! This is an incredible feat that took a lot of meetings, conversations, negotiating, and value engineering sessions. And we accomplished this by delaying the construction of the 7-8 building but keeping all of the other program spaces in-tact.

The Interim Supt. has never expressed concern for how Measure L was being executed prior to the February Board presentation. In-fact, the only negative feedback I have ever heard regarding Measure L came from Trustee Brunner. I am not aware of how Supt. Wayne responds to the Board when these questions arise, however, he has not been very honest with me and began to undermine my position as the Bond manager. Examples include:
- The interim supt. undermining my position by contacting/meeting Measure L architects without my knowledge
- The interim supt. Scheduling Measure L meetings with architects and Vanir CM on a scheduled out-of-town vacation day (I have taken 3 vacation days in 20 months)
- The interim supt. directing me to execute tasks that are in direct conflict with the program (i.e. the February 2017 Board presentation was premature, misleading, and inaccurate; however Dr. Wayne insisted we present the information after I pleaded with him not to)
- E-mails from the interim supt. insinuating that I do not communicate with him, even though I am in constant communication with him and even put out quarterly updates that include his review and comment
- Allowing the Board to supporting negative and unfounded "noise"
- Eliminating my position under the guise of a "reorganization"

It has become increasingly difficult to work under these conditions. Measure L has been nothing but open, honest, and transparent. We have not experienced any problems in working with other HUSD departments,

ROBERTS 000092

the City, contractors, architects, engineers, students, or the general public.

Reference is made to attachment 1 (e-mail #8 dated November 18, 2016) initially expressing my concerns with the program (I never received a response to this e-mail).

I have been running **22** projects this year without a CBO / Asst. Supt. of Business, without a fully engaged Director of Maintenance and Operations, and within a District that seems to be losing control of itself under the leadership of Supt. Wayne. I know the Board will vote on this reorganization this Wednesday, however, I must put on the record the brazen lack of leadership exercised in this decision to eliminate the Chief Facilities Officer in the middle of a $229M bond program that is being executed seamlessly (no audit findings, no contractual issues, no CBOC issues, etc.). I am not against meeting with any Board members, informally or formally, to answer any questions openly, honestly, and directly, before being removed so unceremoniously from this program.

I have included some examples of my continued correspondence with Dr. Wayne on this program, from a presentation to his LLA team in October 2015, to the latest budget information shared with him last week. I urge you to review it in totality - it may open your eyes to some information you did not know existed (or perhaps have been misled to believe otherwise).

The Interim Supt. has _never_ been to my office to appreciate anything we are doing with the Program, and has never been to any of the bi-weekly Measure L design meetings that began September 17, 2015 (my second day on the job), and continue to this day.

I request the Board allow me the opportunity to complete this exceptional program that _will_ deliver state-of-the-art facilities to students, staff, and the Hayward community for decades of teaching and learning to come.

Thank you for your time.


Attachments
1. Brief collection of E-mails to Dr. Wayne communicating important Measure L information from October 2015 through the present.
2. Memo to Dr. Wayne and Delia Ruiz on successful communications with Maintenance, Operations, and Transportation Dept.

Charles Roberts, Ph.D.
Chief Facilities Officer
Hayward Unified School District
p: 510.784.2600 x 72844
e: croberts@husd.k12.ca.us

---

2 attachments

📎 **Attachment 2 Measure L Comm with MOT.pdf**
   2427K

📎 **Attachment 1 Interim Supt Communication.pdf**
   1968K

ROBERTS 000093